UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                  :
MINERVA TEXIDOR             :          3:15 CV 184 (JGM)
                  :
V.                       :
                  :
CAROLYN COLVIN,         :
COMMISSIONER OF SOCIAL SECURITY    :       DATE: FEB. 28, 2017
                  :
------------------------------------------------------ x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND
FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER</u>

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Supplemental Security Income ["SSI"].

<u>I.  ADMINISTRATIVE PROCEEDINGS</u>

      On June 17, 2010, plaintiff applied for SSI benefits claiming that she has been

disabled since that day due to asthma, high blood pressure, heart problems, left eye

blindness, and bipolar disorder.  (Certified Transcript of Administrative Proceedings, dated

May 12, 2015 ["Tr."] 121, 311-16; <u>see</u> Tr. 361).[1]  The Commissioner denied plaintiff's

application initially, and upon reconsideration. (Tr. 144-46, 152-66; <u>see</u> Tr. 149-51).  Plaintiff

requested a hearing before an Administrative Law Judge ["ALJ"](Tr. 167-72),[2] and on July

---

    [1]Plaintiff also applied for Disability Insurance Benefits, which application was denied and is
not the subject of this appeal.  (Tr. 307-10).

    [2]Plaintiff was represented by counsel at the administrative level (Tr. 148, 221, 265-66), and
by different counsel on this appeal.

17, 2013,[3] plaintiff and Dr. Steven Sachs, a vocational expert, testified at a hearing before

ALJ William J. Dolan.  (Tr. 84-102).[4]   In a decision dated July 25, 2013, ALJ Dolan denied

plaintiff's request for benefits.  (Tr. 57-73).  On September 10, 2013, plaintiff filed a request

for review of the ALJ's decision (Tr. 13-14), and on December 15, 2014, after receiving

additional evidence from plaintiff (Tr. 5-7; see generally Tr. 15-56),[5]  the Appeals Council

filed its notice denying plaintiff's request for review, thereby rendering the ALJ's decision the

final decision of the Commissioner.  (Tr. 1-4).

On February 11, 2015, plaintiff commenced this current action (Dkt. #1); the case

was assigned to U.S. Magistrate Judge Donna F. Martinez.  On June 2, 2015, defendant filed

her answer and a copy of the Certified Administrative Transcript, dated May 12, 2015. (Dkt.

---

[3]Plaintiff's hearing was initially scheduled for May 7, 2012 (see Tr. 187-220), then rescheduled to March 21, 2013 (see Tr. 222-64, 267), and then rescheduled to July 17, 2013 (Tr. 268-303).

[4]Previously, on December 10, 2007, plaintiff applied for SSI benefits claiming that she has been disabled since November 16, 2007 due to asthma, high blood pressure, a "heart problem," depression, difficulty dealing with others, and blindness in her left eye. (See 10 CV 701(JGM)(CSH), Dkt. #23, at 1).  On November 4, 2009, ALJ Dolan issued his decision in which he concluded that plaintiff is not disabled.  (Id. at 1-2).  On May 7, 2010, after the case moved through the Decision Review Board, plaintiff appealed the ALJ's decision to this Court. (Id.).  The case was assigned to Senior United States District Judge Charles S. Haight and was referred to this Magistrate Judge. (Id.).  On April 11, 2011, this Magistrate Judge issued her thirty-three page Recommended Ruling granting defendant's Motion to Affirm in part and denying it in part, and granting plaintiff's Motion for Remand in part, recommending that the case be remanded to the ALJ for a rehearing and an assessment of the severity of plaintiff's impairments and RFC findings that include all of plaintiff's limitations.  (Id. at 23-32).  Defendant objected (see 10 CV 701, Dkt. #24), and on September 8, 2014, Judge Haight overruled defendant's objection and adopted this Magistrate Judge's Recommended Ruling pursuant to 28 U.S.C. § 636(b)(1).  (Id., Dkt. #26).

The hearing on the application in this current case occurred before Judge Haight filed his decision in plaintiff's initial case.  (See Tr. 86-87).

[5]See Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996)("[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review of the ALJ's decision.")

#10).[6]  On August 4, 2015, plaintiff filed her Motion to Reverse, or in the alternative, Motion to Remand for a Rehearing (Dkt. #12), and on October 27, 2015, defendant filed her Motion to Affirm.  (Dkt. #17; see Dkts. ##14-15).  On February 6, 2017, this case was transferred to this Magistrate Judge. (Dkt. #19).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #12) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is granted.

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1962 and is fifty-four years old.  (Tr. 311).  Plaintiff lives alone[7] in subsidized housing (Tr. 88, 340, 375), and she has eight grandchildren.  (Tr. 97).  Plaintiff completed the tenth grade (Tr. 87),[8] and her last earnings, of $52, were in 2005.  (Id.; see Tr. 322-24, 333-39).[9]  She receives food stamps and her daughters "get together and pay [her] bills."  (Tr. 88).

Plaintiff had a history of alcohol and drug abuse, but testified at her hearing that she has been clean for eight years.  (Id.).  When asked by the ALJ about an entry in 2012 that reflected social drinking, plaintiff responded that such entry is "wrong" as she has not been

---

[6]There was some duplication in the record.

[7]Although plaintiff testified that she lives alone, she reported to her psychotherapist in October 2012, January 2013, and March 2013 that she lived with her boyfriend of three years.  (Tr. 618, 629, 653; see also Tr. 26).

[8]Plaintiff reported that she was "always in special education[.]" (Tr. 463).

[9]In this job, plaintiff worked as a cashier and a stocked a grocery store; she lifted twenty-five pounds frequently.  (Tr. 350).

drinking.  (Tr. 89).

On a typical day plaintiff wakes, brushes her teeth, cleans, eats breakfast and watches television. (Tr. 88; see Tr. 340 (after she eats and takes her pills, she goes back to bed), 344 (watches television, listens to the radio), 375, 379). Sometimes she does not shower for two to three days.  (Tr. 96).   She spends the majority of her day laying down. (Tr. 91).  She cleans her house but gets tired and has to stop after about a half hour or forty-five minutes.  (Tr. 89; see Tr. 375, 378).  She cleans "[a]bout once a week[,]" and does her laundry (Tr. 95, 343), although she also testified that her daughter does her laundry and grocery shops for her.  (Tr. 95, 379).  She cooks "when [she] want[s] to[,]" but makes microwave meals because she cannot "be on [her] legs too long."  (Tr. 95; see also Tr. 342 (prepares sandwiches or T.V. dinners), 377).  She also reported that her left arm hurts from a previous stroke.  (Tr. 342, 376).  However, she irons clothing, sweeps, and dusts  (Tr. 343), although "sometimes [she] get[s] tired and [she] stop[s]" because of "[s]harp" "pains in her body[,]" in her back, legs and hands.  (Tr. 89, 91; see also Tr. 90-91).  According to plaintiff, she also has problems sitting; she has aches in her lower back.  (Tr. 90).  She does not drive, and she can walk about two or three blocks without stopping.  (Tr. 92; see Tr. 343, 378).  When she walks, or is around dust or heat, she needs to use her inhaler; she uses it twice a day.  (Tr. 92-93; see Tr. 346, 381 (uses it within five minutes of walking)). Additionally, she uses her nebulizer, or, in plaintiff's words, her "breathing machine[,]" every other day, as needed (Tr. 93), and she smokes cigarettes "[o]n and off[.]"  (Id.).

Plaintiff is blind in her left eye, and after an hour of watching television, her eyes "start to go[] blurry and [are] burning."  (Tr. 94; see Tr. 347).  She uses drops, but sometimes when she puts the drops in her eyes and closes her eyes, she "doze[s] off." (Tr.

94).  Her vision makes it hard for her to read.  (Tr. 341).  She cannot see from her left eye and her right eye is blurry.  (Tr. 386).   She has "sleepless nights with headaches" and she feels dizzy.  (Tr. 396).  Plaintiff also testified that she is depressed; she stays home in her room alone in the dark, sometimes looking at pictures of her mother, and will cry.  (Tr. 96; see also Tr. 341, 400).

She takes or has taken Lisinopril, Lexapro/Escitalopram, Hydrochlorothiazide, Combivent/Albuterol/Proventil, Advair, Buspirone, Zolpidem/Ambien, Tramadol, Flector, Systane Ultra, Diclofenac, Cymbalta, Robaxin, Clonazepam, Chantix and Wellbutrin. (Tr. 342, 356, 364, 377, 403-04, 426-27, 501-03).  Her medications "[s]ometimes" help (Tr. 96), and her daughter has to remind her to take her medications.  (Tr. 341, 376).  She does not go to her therapy appointments regularly because she does not have anyone to drive her, and her "legs be [sic] swollen."  (Tr. 97).

According to plaintiff, she cannot work because her back "be [sic] hurting a lot[,]" and she has "issues dealing with . . . people[.]" (Tr. 98).  She does not have friends, and she stays home, although her daughter went with her to Florida.  (Tr. 99; see Tr. 345).  She does not like talking to people because they "annoy" her. (Tr. 345; see Tr. 380 (not like being around anyone)). Plaintiff reported that she gets "very angry a[]lot with others."  (Tr. 381).  Plaintiff's grandchildren come over to her house, but the most she can be around them is about an hour, "[b]ecause they start getting on my nerves. They start making too much noise and too much running around and I be [sic] like no, I can't take it no more."  (Tr. 97). Plaintiff reported that her impairments affect her ability to lift, bend, reach,  stand, walk, talk, climb stairs, see, remember things, complete tasks, get along with others, understand, follow instructions, concentrate, and use her hands.  (Tr. 345, 380).

5

At the hearing, the vocational expert testified that a person who has a history of medium work capacity, with a need to avoid concentrated exposure to temperature extremes, fumes, dust, gases and hazards; is unable to perform jobs requiring good peripheral vision; is limited to simple, routine tasks performed in a stable work environment; and has no more than fleeting public contact, could work as a hand packer, production worker, and production inspector.  (Tr. 99-100).

B. PLAINTIFF'S MEDICAL RECORDS

Plaintiff's onset date of disability for this application is June 17, 2010.  Accordingly, while this Court has reviewed the entire medical transcript,[10] the Court will focus on the medical records for the relevant time period, and the records relating to her alleged impairments.

1. VISION IMPAIRMENT

In November 2007, plaintiff experienced "severe hypotension following an episode of unconsciousness associated with intravenous drug overdose[,]" which led to significant loss of vision in her left eye.  (Tr. 408-09, 519-20).[11]  In September 2008, plaintiff was

_____

[10]In 2006 and 2007, plaintiff was seen at Charter Oak Health Center for asthma, depression, panic disorder and insomnia.  (Tr. 510-12).  In 2007, plaintiff underwent a hysteroscopy.  (Tr. 533-37).  In 2008, plaintiff was seen for a physical; depression, a history of cocaine abuse, and left eye blindness were noted.  (Tr. 506-08).  Also in 2008, plaintiff underwent surgery to remove a mass from her left clavicle.  (Tr. 526-32; see Tr. 563-64, 567).  On September 13, 2013, plaintiff underwent a hysterectomy.  (See Tr. 26-28, 37).

Plaintiff was seen for blood pressure checks on July 14 (Tr. 421-22, 472-73), July 27 (Tr. 419-20, 475-76 (noting everything is much improved)), and October 1, 2009 (Tr. 417-18, 481-82); on January 7 (Tr. 440-42, 486-87) and May 26, 2010 (Tr. 412-14, 488-89); and on April 5, 2011 (Tr. 498-500).

[11]In his report following the consultative exam, Dr. James Ryan, see Section II.C. infra., noted that plaintiff had significant vaginal bleeding caused by fibroids requiring a transfusion of six pints of blood, which might also have contributed to her vision loss.  (Tr. 460; see also Tr. 519). Plaintiff's history of fibroids is detailed in the medical record.  (See, e.g., Tr. 15-16, 536-37, 548-50, 552-54, 571-75).

diagnosed with ischemic optic neuropathy with no recovery in the left eye and moderate recovery in the right eye; she was also diagnosed with "severe dryness." (Tr. 519-20; see also Tr. 408-09). As of December 2009, Dr. David M. Waitzman, a neurologist at UConn Medical Group Neurology Associates, opined that plaintiff had "nearly full visual field in the right eye." (Tr. 408; see Tr. 421 (medical record noting missed June appointment; new appointment rescheduled to November 2009)). Upon examination on April 20, 2011 by Dr. Jessica Olewnik, an optometrist at Charter Oak Health Center ["Charter Oak"], Dr. Olewnik concluded that plaintiff had "profound vision impairment" in one eye and "normal vision" in the other. (Tr. 579; see Tr. 577-79). Dr. Olewnik diagnosed plaintiff with astigmatism and presbyopia, and gave her a new prescription for glasses. (Tr. 579). On August 29, 2012, plaintiff was seen by another optometrist, Dr. Barbara Dune, at Charter Oak for complaints of decreased vision in her right eye. (Tr. 602-05).[12] Again, she was diagnosed with astigmatism and presbyopia, and was given a new prescription for glasses; she was also diagnosed with a cataract. (Tr. 604).

## 2. MENTAL IMPAIRMENTS

Plaintiff's history of generalized anxiety disorder, panic disorder without agoraphobia, and depressive disorder, are reported as "chronic problems" throughout her records. (See, e.g., Tr. 412, 415, 417, 419, 421, 435, 438, 440; see also Tr. 428). On July 14, 2009, plaintiff reported to Dr. Charlene Browne, a physician at Charter Oak, that it was "somewhat difficult to meet home, work, or social obligations[,]" and her symptoms of depression were aggravated by conflict or stress at home or work. (Tr. 421, 472; see Tr. 421-22, 472-73). She reported feeling anxious, having fearful thoughts, an irritable mood, diminished interest

---

[12]In this record, plaintiff reported drinking socially. (Tr. 603).

or pleasure, sleep disturbance, persistent negative thoughts, feelings of guilt or worthlessness, hallucinations, manic episodes, panic attacks, poor concentration, indecisiveness, restlessness or sluggishness, significant changes in appetite, or thoughts of suicide or death.  (Tr. 421, 472). Plaintiff requested to go to psychotherapy.  (Tr. 422, 473; see Tr. 450-54 (referral)).   On January 7, 2010, plaintiff returned to Dr. Browne for depressive symptoms that were "exacerbated [because her] daughter/grandchildren moved to [Florida.]" (Tr. 441, 487; see Tr. 440-42, 486-87).   Dr. Browne prescribed a trial of Lexapro and refilled her Ambien prescription.  (Tr. 441, 487).

Twelve months later, in December 2010, plaintiff made a behavioral service request at Charter Oak for treatment of depression and depressive disorder.  (Tr. 453). However, on March 23, 2011, plaintiff was discharged from Charter Oak behavioral health services for non-compliance with the attendance policy.  (Tr. 496-97).[13]

On September 27, 2012, APRN Patricia Samuels at Charter Oak referred plaintiff for behavioral health services for her chronic pain and depressive symptoms relating to "family dysfunction[.]"  (Tr. 615).  On October 16, 2012, plaintiff was seen by Julie Sarmiento, LPC for individual psychotherapy focusing on anger, depression, and anxiety symptoms.  (Tr. 616-17; see Tr. 618-22).  Plaintiff reported that she "could never hold a job due to anger and bad attitude."  (Tr. 621).  The initial diagnostic impression was major depressive disorder, recurrent, moderate, and cocaine abuse in remission; plaintiff was assessed a GAF score of 55.  (Id.).  Plaintiff missed her next three scheduled appointments.  (Tr. 623-27).   Plaintiff returned to Sarmiento for a treatment plan review on January 17, 2013, at which point she had made no progress in her treatment. (Tr. 631-34).  Again, she was assessed a GAF score

---

[13]Plaintiff was previously discharged from such treatment in 2008.  (Tr. 469).

8

of 55.  (Tr. 633).  Plaintiff missed her next three appointments.  (Tr. 635-37, 646).

On March 19, 2013, plaintiff returned for a psychiatric evaluation; she was seen by APRN Michelle Nwigwe.  (Tr. 647-51).  Plaintiff reported that she prefers to stay inside, away from everyone else, so that she does not have a relapse with drugs.  (Tr. 649).  She sleeps during the day, and stays up at night, which was a habit she formed when she "was on drugs[.]" (Id.).  Her affect was appropriate; her judgment, reasoning, impulse control and insight were fair; and her thought process was logical.  (Tr. 650).   On March 26, 2013, plaintiff's treatment plan was reviewed by her counselor.  (Tr. 656-57).

Plaintiff was seen by Dr. Ashok Parekh, a psychiatrist at Charter Oak, on June 10, 2013 for depression.  (Tr. 662-64).  Dr. Parekh noted that plaintiff has been "poorly compliant" with medication, and appointments for medication management and therapy, and that she continues to complain of feeling depressed, with poor sleep.  (Tr. 662).  On June 18, 2013, Sarmiento noted improvement in plaintiff's sleep pattern, and that plaintiff was feeling very positive.  (Tr. 665-68).  On August 6, 2013, Dr. Parekh noted moderate improvement in plaintiff's depression with medication, but also noted that plaintiff has been "poorly compliant" with her medication and therapy appointments.  (Tr. 18-19).  Plaintiff missed her next three appointments (Tr. 30-32), and on October 3, 2013, she was discharged from therapy for poor compliance with attending scheduled appointments.  (Tr. 33-36; see Tr. 43-44).

On April 17, 2014, plaintiff returned to Charter Oak seeking a referral back to behavioral health (Tr. 48-50); however, she did not show for her assessment on May 19, 2014 (Tr. 51-54), and she did not respond to correspondence sent to her regarding her missed appointment.  (Tr. 55-56).

### 3. ASTHMA

On July 14, 2009, Dr. Browne diagnosed plaintiff with "[e]xtrinsic asthma" (Tr. 422), for which weather and environmental allergens were the aggravating symptoms.  (Tr. 421).  Plaintiff's asthma was classified as "mild persistent."  (Id.).  A week after plaintiff was placed on medication, she was "much improved[.]" (Tr. 419-20, 475-76).

On July 22, 2010, plaintiff was seen at the Hartford Hospital Emergency Center for an asthma exacerbation.  (Tr. 522-23).[14]  On August 3, 2010, plaintiff was seen for a follow up examination with Dr. Browne; she was experiencing "mild nocturnal symptoms[,]" and was advised to "cut down on smoking[.]" (Tr. 435-36, 443-45, 490-92).  On October 13, 2010, plaintiff had no wheezing and her lungs were clear.  (Tr. 438-39, 446-47, 493-94).  On October 6, 2011, Dr. Browne saw plaintiff for her "mild[,] intermittent[,]" "nocturnal, non-allergic and seasonal[]" asthma.  (Tr. 585; see Tr. 585-86).  Dr. Browne described plaintiff's asthma as "stable[.]" (Tr. 586).

### 4. BACK, KNEE AND GENERALIZED PAIN

On May 26, 2010, plaintiff was seen by Dr. Browne at Charter Oak for complaints of intermittent lower back pain; Dr. Browne prescribed Tramadol.  (Tr. 412-14, 488-89).  On December 29, 2010, plaintiff was taken to Hartford Hospital by ambulance for complaints of left back and flank pain.  (Tr. 538-46; see Tr. 571-72, 645).  She was diagnosed with a urinary tract infection and uterine fibroids.  (Tr. 546).  Plaintiff returned to Charter Oak on April 5, 2011 with complaints of bilateral knee pain that resulted in decreased mobility, instability, swelling and tenderness.  (Tr. 498-500).  Plaintiff was seen by Dr. Browne on August 24, 2011 with complaints of generalized body pain with fatigue and difficulty sleeping.

---

[14]Nineteen days earlier, plaintiff was seen at the emergency room with a cough.  (Tr. 524-25).

(Tr. 581-83).   Dr. Browne noted that plaintiff was positive for bone/joint symptoms, muscle weakness, and myalgia; she ordered body scans and gave plaintiff a trial of pain medications. (Tr. 582).   On September 2, 2011, plaintiff underwent a bone scan, the results of which revealed "[m]ild nonspecific abnormalities" in her "humeral heads[,]" "first carpmetacarpal joint[,]" and "patellar compartment of both knees."   (Tr. 591).  On the same day, she also underwent a CT scan of her head, the results of which were normal.   (Tr. 594).   She returned to Dr. Browne on October 6, 2011, requesting a letter excusing her from jury duty. (Tr. 585-86; see Tr. 584).

Plaintiff was seen at Charter Oak on February 22, 2012 after perforating her ear with a q-tip.   (Tr. 587-89).   Plaintiff was seen by APRN Patricia Samuels  at Charter Oak on May 1, 2012 for complaints of bilateral leg pain and generalized body ache.   (Tr. 599-601). Plaintiff reported that she suffers from "arthritic pain making it difficult for her to go out and party with her daughters."   (Tr. 599).   She was prescribed Tramadol and a Lidoderm patch. (Tr. 600).   On September 27, 2012, plaintiff reported that the Tramadol was not effective; she requested a stronger medication.   (Tr. 611-14).   APRN Samuels prescribed Robaxin.   (Tr. 612).

Plaintiff returned to Charter Oak on December 18, 2012 with complaints of "vague, diffuse pains[,]" for which she was given Cymbalta, which would help with her body pain as well as her anxiety and depression.   (Tr. 628-30).  Plaintiff was seen by Dr. Rita Bustamante on March 19, 2013 to receive "paperwork" to be "sent to attorney's office."   (Tr. 653-55). Plaintiff was seen at Charter Oak on July 19, 2013 for itchiness on the soles of her feet and palms of both hands; she was treated for a rash.   (Tr. 79-81).   She did not return for a follow up appointment three days later.   (Tr. 82-83).   On October 25, 2013, Dr. Bustamante

referred plaintiff for Hartford Hospital's Orthopedics Clinic for bilateral knee pain; the X-rays were remarkable for degenerative changes.  (Tr. 37-38; see Tr. 39-42, 45-46).

C. MEDICAL OPINIONS

On December 29, 2010, plaintiff underwent a consultative examination with Dr. James Ryan in connection with her application for benefits.  (Tr. 455-61).  Plaintiff stood while she recited her medical history because her "back was too painful[,]" and Dr. Ryan noted that plaintiff was "walking with a limp." (Tr. 456).  Dr. Ryan opined that plaintiff has an abnormal gait and had difficulty with heel-to-toe, toe walking, and heel walking, all due to pain, and there was weakness in her left arm due to pain in her shoulder.  (Tr. 460).  She had 20/20 visual acuity in the right and 0 on the left, and she had decreased abduction of her left arm above her head to fifty degrees due to pain, and pain in her lower back on forward bending and squatting.  (Tr. 459).   Dr. Ryan noted that plaintiff's history of asthma interferes with her ability to walk, although upon examination, she did not exhibit any respiratory abnormality.  (Tr. 460).  Dr. Ryan noted that plaintiff "has significant depression issues and states she has bipolar disorder" and depression, as she is "fearful of losing sight in her right eye[,]" and she has a "combination problem of having difficulty being around people, but then [is] lonely when she is not with people." (Tr. 460).

Dr. Ryan opined that plaintiff is capable of walking ten minutes before she becomes short of breath and develops back pain; she can stand fifteen minutes before her back bothers her; she can lift up to eight pounds; and sitting is "very problematic[.]" (Tr. 461).  She has difficulty carrying objects because of her back pain, and traveling is limited by her asthma, low back discomfort, and depression, and she is "finding difficulty . . . interact[ing] with others." (Id.).

12

On January 25, 2011, Dr. Carol Honeychurch completed a Physical Residual Capacity Assessment of plaintiff for SSA in which she opined that plaintiff is capable of occasionally lifting, carrying and pulling fifty pounds; frequently lifting, carrying and pulling twenty-five pounds; and standing, walking and/or sitting for six hours in an eight-hour day. (Tr. 126; see Tr. 125-27). Plaintiff has visual limitations, with loss of vision in her left eye and with mild reduction in her peripheral vision in her right eye, and must avoid concentrated exposure to extreme cold; to fumes, orders, dusts, gases and poor ventilation; and to hazards. (Tr. 126-27).

On February 9, 2011, Jay Cudrin, Ph.D., completed a Mental Status Examination of plaintiff in connection with her application for benefits. (Tr. 462-64). Upon testing, plaintiff's score "raised questions about possible symptom exaggeration[,]" and she had trouble remembering exactly when events in her life took place. (Tr. 462). She reported to Dr. Cudrin that she attributed her "lengthy unemployment to her poor attitude and argumentativeness." (Id.). She reported that she relies on others to do shopping and laundry and is able to cook, clean, bathe and dress. (Tr. 463). Dr. Cudrin observed that plaintiff rocked in her chair, and was constantly nervous. (Tr. 464). His diagnoses were: possible bipolar disorder; possible generalized anxiety disorder; possible agoraphobia; and cocaine and alcohol dependence, presently under control. (Id.).

On February 23, 2011, Dr. Edgardo Lorenzo completed a Psychiatric Review Technique of plaintiff for SSA in which he opined that plaintiff has moderate restriction maintaining social functioning, but is otherwise not limited. (Tr. 124; see also Tr. 123). Dr. Lorenzo noted that plaintiff's "subjective complaints are worse than her objective findings." (Tr. 124). Additionally, Dr. Lorenzo found that plaintiff is moderately limited in her ability to

interact appropriately with the general public, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 128; <u>see</u> Tr. 127-28).  He noted that she is "able to relate[] to others where interactions are brief and superficial.  She is best in less demanding public settings given her [history] of mood disorder. . . ."  (Tr. 128).   On April 11, 2011, Robert Sutton, Ph.D., completed a Mental Residual Functional Capacity Assessment of plaintiff for SSA in which he reached the same conclusions as Dr. Lorenzo.  (<u>Compare</u> Tr. 140-41 <u>with</u> Tr. 127-28).

On May 12, 2011, Dr. Abraham Bernstein completed a Physical Residual Functional Capacity Assessment of plaintiff for SSA.  (Tr. 138-40).  Dr. Bernstein reached conclusions identical to those reached by Dr. Honeychurch.  (<u>Compare id.</u> <u>with</u> Tr. 125-27).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  <u>See Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008), <u>quoting Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>see also</u> 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)(citation omitted); <u>see Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  However, the court may not decide facts, reweigh

14

evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

## IV.  DISCUSSION

Following the five step evaluation process,[15] ALJ Dolan found that plaintiff has not engaged in any substantial gainful activity since June 17, 2010, the date of her application. (Tr. 62).  ALJ Dolan then concluded that plaintiff has the following severe impairments: polysubstance abuse; depression; anxiety disorder; post traumatic stress disorder; asthma; and left eye blindness, status post cocaine induced cerebrovascular accident.   (Tr. 62-64, citing 20 C.F.R. § 416.920(c)). In the third step of the evaluation process, the ALJ concluded

---

[15]Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 416.920.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 416.920(a)(4)(i).  If the claimant is currently employed, the claim is denied.  See id.  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

that plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 64-66, citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926).  In addition, at step four, ALJ Dolan found that after consideration of the entire record, plaintiff has the residual functional capacity ["RFC"] to perform medium work as defined in 20 C.F.R. § 416.967(c), except that she needs to avoid concentrated exposure to temperature extremes, fumes, dust, gases and hazards; she cannot perform jobs that require good peripheral vision; and, she is limited to performing simple, routine tasks in a stable work environment, with no more than brief, superficial interaction with the public and co-workers.  (Tr. 66-72).  Plaintiff has no past relevant work, but the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, and thus a finding of "not disabled" is appropriate.  (Tr. 72-73, citing 20 C.F.R. §§ 416.965, 416.963, 416.964, 416.968, 416.969, 416.969(a)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ committed factual errors (Dkt. #12, Brief at 8-11); the ALJ failed to make proper weight assignments and substituted his judgment for that of plaintiff's doctors (id. at 11-14); the ALJ did not properly determine plaintiff's credibility (id. at 14-16); the ALJ erred in his RFC assessment (id. at 16-20); and defendant failed to meet her burden of proof. (Id. at 20-23).

Defendant contends that the ALJ did not mischaracterize evidence regarding plaintiff's October 16, 2012 mental status examination (Dkt. #17, Brief at 17-19); the ALJ properly weighed the medical evidence (id. at 20-21); the ALJ properly assessed plaintiff's credibility (id. at 22-23); the ALJ properly determined plaintiff's RFC (id. at 23-26); and the ALJ met the burden of proof at Step Five of the sequential analysis.  (Id. at 26-27).

A. MENTAL STATUS EXAMINATION AND CONSIDERATION OF PLAINTIFF'S MENTAL IMPAIRMENT

In his decision, ALJ Dolan described the mental status examination performed on October 16, 2012 as "essentially normal." (Tr. 69). He continued:

> It was noted that her prior mental treatment history was scarce, and that on examination, her memory was intact, her attitude was cooperative, and her attention was gained and maintained. It was further noted that her impulse control, judgment and insight were fair, that her intelligence was average, that her thought processes were logical, and that her thought content was unremarkable. She was also assigned a GAF score of 55, again indicative of only moderate symptoms.

(Id.)(citation omitted). Plaintiff is correct that the ALJ did not note that plaintiff's affect was constricted, and her mood was anxious, irritable and depressed, but the ALJ did conclude that the examination was "essentially" normal, thus, acknowledging that there were some symptoms that were not normal.[16] The ALJ's consideration of plaintiff's mental health impairment(s), however, did not rise and fall with his treatment of this October 16, 2012 mental status examination. Rather, in his decision, the ALJ discusses plaintiff's history of mental health treatment from July 2009 to July 2013 (Tr. 69-70), and his discussion thereof formed the basis for his conclusion regarding plaintiff's mental health impairment(s).[17]

As discussed above, and as discussed in the ALJ's decision, plaintiff has been treated at Charter Oak for symptoms of depression and panic disorder, on and off, since 2009. In

---

[16]Additionally, although plaintiff contends that the ALJ erred in not noting that plaintiff drives her family crazy and talks too much, the ALJ need not rely on plaintiff's self reports that her family "sa[id] that [she] talks too much, and that she 'drives them crazy.'" (Dkt. #12, Brief at 9, citing Tr. 621).

[17]Although plaintiff cites to several cases in which remand was ordered in light of factual errors made by ALJs (see Dkt. #12, Brief at 10-11), the cases upon which plaintiff relies differ significantly from the case at hand. As discussed herein, the ALJ's conclusion regarding plaintiff's mental health impairment(s) is supported by substantial evidence in the record, which the ALJ discussed in his decision.

July 2009, plaintiff reported to Dr. Browne that it was "somewhat difficult to meet home, work, or social obligations[,]" and her symptoms of depression were aggravated by conflict or stress at home or work.  (Tr. 421, 472; see Tr. 421-22, 472-73).  On January 7, 2010, plaintiff reported that her depressive symptoms "exacerbated [because her] daughter/grandchildren moved to [Florida.]" (Tr. 441, 487; see Tr. 440-42, 486-87).  She was treated with a trial of Lexapro.  (Tr. 441, 487).  However, she did not seek treatment again until December 2010, when she requested to be referred for behavioral services for treatment of depression and depressive disorder.  (Tr. 453). However, she was discharged from such services on March 23, 2011, for non-compliance with the attendance policy.  (Tr. 466).  A year and a half later, on September 27, 2012, APRN Samuels referred plaintiff back to behavioral health services for her chronic pain and depressive symptoms  (Tr. 615), and in October 2012, plaintiff was seen by her counselor, Sarmiento, for individual psychotherapy focusing on anger, depression, and anxiety symptoms. (Tr. 616-17; see Tr. 618-22).  At that time, she reported that she "could never hold a job due to anger and bad attitude[]"; the initial diagnostic impression was major depressive disorder, recurrent, moderate, and cocaine abuse in remission; and plaintiff was assessed a GAF score of 55.  (Tr. 621).  However, plaintiff missed her next three scheduled appointments  (Tr. 623-27), and when she returned to Sarmiento for a treatment plan review on January 17, 2013, no progress was noted. (Tr. 631-34).  Again, she missed her next three appointments.  (Tr. 635-37, 646).  In March 2013, plaintiff returned for a psychiatric evaluation by APRN Nwigwe. (Tr. 647-51).  At that time, plaintiff's affect was appropriate; her judgment, reasoning, impulse control and insight were fair; and her thought process was logical.  (Tr. 650).  Three months later, in June 2013, Dr. Parekh noted that plaintiff has been "poorly compliant" with medication and with her

appointments for medication management and therapy, and that she continued to complain of feeling depressed, with poor sleep.  (Tr. 662).  However, later that month, Sarmiento noted improvement in plaintiff's sleep pattern, and that plaintiff was feeling very positive.  (Tr. 665-68).  On August 6, 2013, Dr. Parekh noted moderate improvement in plaintiff's depression with medication, but also noted that plaintiff had been "poorly compliant" with her medication and therapy appointments.   (Tr. 18-19). Plaintiff missed her next three appointments  (Tr. 30-32), and on October 3, 2013, she was discharged from therapy for poor compliance with attending scheduled appointments.  (Tr. 33-36; see Tr. 43-44).  Seven months later, on April 17, 2014, plaintiff returned to Charter Oak seeking a referral back to behavioral health services (Tr. 48-50); however, she did not show for her assessment on May 19, 2014 (Tr. 51-54), and she did not respond to correspondence sent to her regarding her missed appointment.  (Tr. 55-56).

Thus, after discussion and consideration of plaintiff's sporadic mental health treatment records, the ALJ concluded that "[a]lthough the claimant does have limitations, the objective evidence does not support total disability." (Tr. 71).  He continued, "[w]hile the record does demonstrate distress on the claimant's part, mental health treatment records show that this distress stemmed more from situational factors, rather than from mental illness." (Id.).  The ALJ's conclusion is supported by substantial evidence in the record as discussed above.

B. ASSIGNMENT OF WEIGHT TO MEDICAL OPINIONS

In his decision, the ALJ relied on the opinions of Dr. Sutton and Dr. Cudrin to support his RFC findings (Tr. 70-71), and he afforded "[l]ittle weight" to the "opinion/assessment of Dr. Ryan[.]" (Tr. 71).   The ALJ found that "Dr. Ryan merely parroted the claimant's

subjective complaints," accepting her subjective reports as true, when "there exist good reasons for questioning the reliability of the claimant's subjective complaints."   (Id.). Additionally, the ALJ afforded "[s]ome weight" to plaintiff's GAF scores "as reflective of [her] functioning at the given time of that test."   (Id.).

Plaintiff contends that the ALJ erred in assigning "[l]ittle weight" to Dr. Ryan's opinion; the ALJ erred in not assigning weight to APRN Nwigwe, who conducted plaintiff's psychiatric evaluation on March 19, 2013, whose opinion "is supported not just by the medical records as a whole, but by . . . [Dr. Cudrin] whose opinion the ALJ assigned 'some weight[]'"; and, the ALJ erroneously assigned "[s]ome weight" to plaintiff's GAF scores.  (Dkt. #12, Brief at 11-13).

As discussed above, Dr. Ryan's assessment of plaintiff during his consultative examination reflects plaintiff's recitation of her medical history, her symptoms, and her self reports.  (Tr. 455-61).  In addition to noting plaintiff's reports, he also noted that plaintiff was "walking with a limp[]"  (Tr. 456); plaintiff had an abnormal gait and had difficulty with heel-to-toe, toe walking, and heel walking, all due to pain, and that there was weakness in her left arm due to pain in her shoulder (Tr. 460); he also noted that she had decreased abduction of her left arm above her head to fifty degrees due to pain, and pain in her lower back on forward bending and squatting.  (Tr. 459).   However, as the ALJ noted in his decision, physical examinations of plaintiff throughout the record have "been essentially normal."   (Tr. 71, see Tr. 412-14, 488-89 (5/26/10: complaints of intermittent back pain; examination reveals normal flexion, normal extension, normal lateral flexion, normal rotation, negative straight leg raising); Tr. 538-46 (same day as 12/29/10 examination with Dr. Ryan, plaintiff taken by ambulance to Hartford Hospital with complaints of left back and flank pain;

reports no previous history of this pain; after tests, and multiple doses of pain medication, conclude pain is of unknown etiology)).   There are no objective medical signs or laboratory findings that support the physical limitations noted by Dr. Ryan. See 20 C.F.R. § 416.927(c)(3)(Greater weight is assigned to opinions supported by "medical signs and laboratory findings.").   Such objective medical signs and laboratory findings are particularly important "because nonexamining sources have no examining or treating relationship[,]" thus, the weight assigned to their opinions "will depend on the degree to which they provide supporting explanations for their opinions." Id.   Thus, under the circumstances of this case, the ALJ did not err in his treatment fo Dr. Ryan's opinion.

Plaintiff is incorrect that APRN Nwigwe, whose only involvement with plaintiff was to complete a one-time psychiatric evaluation, is a "treating source" whose opinion is entitled to significant weight.   (Dkt. #12, Brief at 12-13).   A treating source's opinion is usually assigned greater weight than a non-treating source, 20 C.F.R. § 416.927(c)(2), however, APRNs are not equivalent to treating physicians and cannot give medical opinions.  20 C.F.R. § 404.416.913(a)("[A]cceptable sources of medical information" include licensed physicians, licensed osteopaths, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists).[18] "[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008), citing

---

[18]Additionally, while plaintiff was later treated by Dr. Parekh, "there is no indication [that a] psychiatrist treated, or even examined, [p]laintiff[]" in coordination with APRN Nwigwe, so that "the ALJ was not required to treat [APRN Nwigwe's] opinion as one from an 'acceptable medical source.'" Goulart v. Colvin, No. 15 CV 1573 (WIG), 2017 WL 253949, at *4 (D. Conn. Jan. 20, 2017).

20 C.F.R. § 416.913(d)(1).   Thus, while the ALJ properly discussed APRN Nwigwe's findings when considering plaintiff's treatment history (see Tr. 69), the ALJ did not err in not assigning weight to APRN Nwigwe's psychiatric evaluation.

Plaintiff is correct that a GAF score is not a reliable indicator of impairment severity; however, in this case, the ALJ did not rely on plaintiff's GAF scores as dispositive of her impairment severity, or the lack thereof.   See Ortiz v. Colvin, No. 15 CV 956 (SALM), 2016 WL 4005605, at *4, n.2 (D. Conn. July 26, 2016)("[A] GAF score is not necessarily a reliable basis upon which to assess the severity of a claimant's mental impairment(s)."), citing Carton v. Colvin, No. 13 CV 379 (CSH)(JGM), 2014 WL 108597, at *15 (D. Conn. Jan. 9, 2014)("[T]he ALJ erred in relying on the GAF score as . . . indicative of the severity of plaintiff's mental impairment."); Mateo v. Colvin, No. 14 CV 6109 (MKB), 2016 WL 1255724, at *15 (E.D.N.Y. Mar. 28, 2016)("The Second Circuit has not assessed whether a GAF generally provides a reliable basis for disability determinations[.]")(citation & internal quotations omitted); Griffin v. Colvin, No. 15 CV 105 (JGM), 2016 WL 912164, at *16 (D. Conn. Mar. 7, 2016)(finding the ALJ erred in rejecting the opinion of the treating physicians "on the basis that they were not supported by the GAF scores that the treating sources assigned[ ]" where "[t]he DSM-V eliminates the use of GAF scores entirely" (citation & internal quotation marks omitted)).   Accordingly, the ALJ did not err in his reference to plaintiff's GAF scores.

C. ALJ'S CREDIBILITY ASSESSMENT

Plaintiff contends that the ALJ erred in failing to credit plaintiff's subjective complaints and testimony regarding her pain, and such error led to an erroneous RFC finding that did not account for plaintiff's limitations caused by her pain.   (Dkt. #12, Brief at 14-16).   A strong

indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record. See Social Security Ruling ["SSR"] 96-7p, 61 Fed. Reg 34483, 34486 (S.S.A. July 2, 1996), superseded by SSR 16-3p, 2016 WL 1237954 (S.S.A. Mar. 24, 2016); see Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). An ALJ must compare a claimant's statements made in connection with her claim with statements she made under other circumstances that are in the case record, and statements a claimant made to treating and examining medical sources are especially important. "After weighing any existing inconsistencies between the plaintiff's testimony of pain and limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment." Romano v. Apfel, No. 99 CIV 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted); see Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013). "Where supported by specific reasons, 'an ALJ's credibility determination is generally entitled to deference on appeal.'" Evans v. Colvin, 649 F. App'x 35, 39 (2d Cir. 2016), quoting Selian, 708 F.3d at 420.

In his decision, the ALJ considered plaintiff's subjective complaints (see Tr. 62-63), compared them to the objective evidence in the record, and then discussed why he found such complaints not credible. (See Tr. 62-63, 66-72). As the ALJ stated in his decision, and as is reflected in the record, plaintiff's "described daily activities . . . are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 71). Plaintiff spends her days laying down, watching television (see Tr. 91, 344, 375, 379), but is also able to clean her house; she irons, dusts and sweeps, does laundry, and makes microwavable meals. (See Tr. 89, 95, 343, 377). Additionally, as discussed above, with support in the record, the ALJ concluded that plaintiff's physical and mental status

23

examinations were "essentially normal[]" and her treatment was "essentially routine and conservative in nature, with a general improvement in her functioning with both additional mental and physical treatment."  (Tr. 71; <u>see</u> Tr. 18-19, 665-68 (noting improvement when compliant with medication and treatment)).  The ALJ also appropriately noted that plaintiff failed to follow-up on recommendations made by her treating doctors, and cancelled and failed to show for multiple appointments.  (Tr. 71); <u>see</u> 20 C.F.R. § 416.930(a)(in order to be eligible for benefits, a claimant must follow prescribed treatment).  Additionally, the ALJ appropriately noted plaintiff's inconsistent statements regarding her use of substances, and her substance abuse history.  (Tr. 71-72).  Accordingly, in light of the ALJ's articulated support for his credibility finding, this Court defers to this ALJ's credibility assessment.

   D. RFC DETERMINATION

   In his decision, the ALJ concluded that plaintiff retains the RFC for medium work, "except she needs to avoid concentrate[d] exposure to temperature extremes, fumes, dust, and gases and hazards[]"; "[s]he cannot perform jobs that require good peripheral vision[]"; and "[s]he is limited to performing simple, routine tasks in a stable work environment, with no more than brief superficial interaction with the public and co-workers." (Tr. 66).  Plaintiff contends that the ALJ improperly determined her RFC by failing to account for her "compromised[]" vision in her right eye (Dkt. #12, Brief at 17-18); failing to account for the severity of her psychological impairments (<u>id.</u> at 18); and failing to account for her limitations due to her asthma and pain (<u>id.</u> at 18-19).

   As defendant appropriately observes, the medical records do not support plaintiff's claim of "compromised" vision in her right eye. (Dkt. #17, Brief at 23); <u>see</u> Tr. 408, 459, 579 (vision in right eye is normal).  Additionally, the record, upon which the ALJ relied, described

plaintiff's asthma as "mild" (Tr. 585), "well controlled" on medication (Tr. 500), "mu[c]h improved" after placed on medication (Tr. 419-20, 475-76), and "stable[.]" (Tr. 586). Moreover, the ALJ accounted for plaintiff's asthma by limiting her exposure to temperature extremes, fumes, dust and gases. (Tr. 66). Similarly, plaintiff's subjective complaints of pain are not supported by the objective medical record, and thus do not support a more limited RFC assessment. (See Tr. 591 ("[m]ild nonspecific abnormalities" revealed on bone scan); Tr. 599 (complaints of arthritic pain infringing on social life); Tr. 628-30 ("vague, diffuse pains[]" for which she was given pain medication)).

The ALJ also accounted for plaintiff's psychological impairments by limiting plaintiff to "performing simple, routine tasks in a stable work environment, with no more than brief superficial interaction with the public and co-workers." (Tr. 66). The ALJ noted in his decision that the medical records do not support the "level of symptomatology as alleged by the claimant." (Tr. 69; see Tr. 422 ("No unusual anxiety or evidence of depression."); Tr. 440-41 (negative for anxiety, normal insight, judgment, attention span, and concentration); Tr. 588 (no psychiatric symptoms or unusual evidence of depression or anxiety)). Additionally, as discussed above, the ALJ noted that plaintiff was non-compliant with her mental health treatment, which ultimately led to her discharge from those services. (Tr. 69; see Tr. 465-66, 624, 626-27, 635-36, 646, 662-63). That said, however, the ALJ's limitation of "no more than brief superficial interaction with the public and co-workers[]" accounts for her documented issues with anger and her difficulty interacting with others. (See Tr. 98 (cannot work because of issues dealing with people), 345 (people "annoy" her), 381 (gets "angry a[]lot with others"), 545 (doctor noting plaintiff's anger towards him while treating her)).

25

The Second Circuit has made clear that an RFC assessment need not "perfectly correspond with any of the opinions of the medical sources cited in [the ALJ's] decision[.]" Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013).  Rather, an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."  Id., citing Richardson v. Perales, 402 U.S. 389, 399 (1971).  In this case, the ALJ, relying on the treatment records, plaintiff's testimony and self reports, and the medical opinions of record, articulated his basis for the RFC assessment, and the limitations accounted for in the ALJ's RFC assessment are supported by substantial evidence in the record.

### E. BURDEN OF PROOF AT STEP FIVE

Plaintiff argues that the ALJ failed to meet the burden of proof at Step Five of the sequential evaluation because plaintiff does not have the RFC to perform the jobs described by the vocational expert.  (Dkt. #12, Brief at 20-23).  Specifically, plaintiff contends that the ALJ erred in concluding that plaintiff can perform the work of a hand packer because of her visual limitations and because it is loud; she cannot perform the work of a production worker because of her visual limitations and because it involves exposure to hazards; and she cannot perform the work of a production inspector because of her visual limitations and because it involves exposure to wetness and humidity.  (Id. at 21-23).

At the hearing, the ALJ asked the vocational expert whether a hypothetical individual could perform jobs in the regional or national economy if such individual had "a need to avoid concentrated exposure to temperature extremes"; if such an individual had a "need to avoid . . . concentrated exposure to . . . hazards"; and if such individual is "unable to perform jobs that require good peripheral vision[.]" (Tr. 100).  In response, the vocational expert

26

identified the jobs of a hand packer, production worker and production inspector.  (Id.).  As discussed above, the limitations accounted for in the ALJ's RFC assessment are supported by the record.   Thus, plaintiff's visual limitations have been accounted for in the RFC. Additionally, although plaintiff contends that a loud work environment is inconsistent with the limitation that she work in a "stable" environment, a stable environment, as defendant correctly observes, means "unchanging, not quiet."  (Dkt. #17, Brief at 26).  There are no documented limitations to plaintiff's ability to be exposed to loud noise.  Similarly, while the record supports a restriction on plaintiff's exposure to temperature extremes, there is no support for a limitation on her exposure to wetness and humidity.

Plaintiff contends that she cannot perform the work of a production worker because she cannot work with hazardous tools, including pneumatic nailers. (Dkt. #12, Brief at 21-22).  Defendant observes that the job description states "hammer or  pneumatic nailer[,]" and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles specifically provides that "proximity to moving mechanical parts" and other hazards is not required for this position.  (Dkt. #17, Brief at 26-27)(emphasis in original).[19]  Plaintiff also contends that the ALJ improperly "cherry-picked" the testimony of the vocational expert and ignored his response to the inquiry about whether such a hypothetical individual would be able to perform any job if he or she were "unable to maintain an acceptable work pace, [be] absent one day per week, [and be] off task occasionally[.]" (Dkt. #12, Brief at 23).  The ALJ did not rely on this final hypothetical, and instead based his RFC determination on his first hypothetical.  (Compare Tr. 100 with Tr. 66).

_____

[19]Additionally, to the extent there was confusion about whether there was hazards involved in this job, plaintiff's counsel at the hearing level had the opportunity to cross examine the vocational expert as to the specifics of these stated jobs, but did not do so.  (See Tr. 100-01).

Because the additional limitations "were not part of the RFC, the ALJ was justified in disregarding these portions of the vocational expert's testimony." Healy v. Colvin, No. 15 CV 1579 (JAM), 2016 WL 4581403, at *8 (D. Conn. Sept. 2, 2016), citing Carvey v. Astrue, 380 F. App'x 50, 54 (2d Cir. 2010)("necessarily" rejecting claim that vocational expert's opinion was based on flawed RFC, where court had "already concluded that substantial record evidence supports" that RFC).  Accordingly, this Court concludes that the ALJ sustained his burden at Step Five.

## IV. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #12) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is granted.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)(**written objection to ruling must be filed within fourteen calendar days after service of same**); FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Impala v. United States Dept. of Justice, No. 15-3055, 2016 WL 6787933 (2d Cir. Nov. 15, 2016)(summary order)(**failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit**); cf. Small v. Sec'y of HHS, 892 F.2d 15, 16 (2d Cir. 1989)(**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit**).

Dated at New Haven, Connecticut, this 28th day of February, 2017.


    /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge